**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Jahinnslerth Orozco,** ) | |
| ) | |
| **Plaintiff,** ) | **Civ. Action #** |
| **v.** ) | |
| ) | **1:07CV000444 [EGS]** |
| ) | |
| **Today's Bus, Inc.** ) | |
| ) | **Jury Trial Demand** |
| ) | |
| **and** ) | |
| **Dong Jia Yong, President** ) | |
| **in his official capacity** ) | |
| **Today's Bus, Inc.** ) | |
| ) | |
| **and** ) | |
| **Ming Yu, Manager** ) | |
| **in his official capacity** ) | |
| **Today's Bus, Inc.** ) | |
| ) | |
| **and** ) | |
| **Wilcar Tours, Inc.** ) | |
| ) | |
| **and** ) | |
| **William Ruiz, President** ) | |
| **in his official capacity** ) | |
| **Wilcar Tours, Inc.** ) | |
| ) | |
| **and** ) | |
| ) | |
| **New Today Bus Corp., dba Today's Bus** ) | |
| ) | |
| **and** ) | |
| ) | |
| **Pao Hua Yu, President** ) | |
| **in her official capacity** ) | |
| **New Today Bus Corp., dba Today's Bus** ) | |
| ) | |
| **and** ) | |
| ) | |
| **Tom Chan, Manager** ) | |
| **in his official capacity** ) | |
| **New Today Bus Corp., dba Today's Bus** ) | |

| | |
|---|---|
| and | ) |
| | ) |
| **Jimmy Zhang, Manager** | ) |
| **in his official capacity** | ) |
| **New Today Bus Corp., dba Today's Bus** | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| _____ | ) |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## MOTIONS TO DISMISS FIRST AMENDED COMPLAINT

    I.    **Plaintiff's First Amended Complaint Sufficiently States Plausible Causes of Action Against Defendants New Today Bus Corporation, Jimmy Zhang, and Pao Hua Yu**

Plaintiff's First Amended Complaint is sufficiently detailed to establish plausible causes of action under the Americans with Disabilities Act (ADA) and the DC Human Rights Act against New Today Bus Corporation, Jimmy Zhang, and Pao Hua Yu. For the reasons set forth below, Plaintiff moves this Court to deny the Motions to Dismiss filed by these Defendants.[1]

The Amended Complaint sets forth facts that exceed the requisite "short and plain statement of the claim[s]" in order to give the defendants fair notice of the claims and their bases. Bell Atlantic Corp. v. Twombly, 127 Sup.Ct. 1955, 1965 (2007). Plaintiff Jahinnslerth Orozco alleged facts comprising defendants' liability that are "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." **Id**., 127 S. Ct. at 1964-65. The Amended Complaint is more than sufficient "to state a claim for

---

[1] **Defendants' Motions to Dismiss cite no legal basis for dismissal. The motions generically reference the "Federal Rules of Civil Procedure" without specifying any underlying ground(s), in violation of LcvR 7(a) that "[e]ach motion shall include or be accompanied by a statement of the specific points of law and authority that support the motion…" As such, the Court may deny the Motions to Dismiss based on Defendants' failure to conform to LcvR 7(a), without reaching the merits. Nevertheless, in this Memorandum in Opposition, Plaintiff sets out the substantive legal arguments for denial of the motions.**

relief that is plausible on its face." Id., 127 S.Ct. at 1968, 1974; Sparrow v. United Airlines, 216 F.3d 1111, 1114-15 (D.C.Cir. 2000); Maniaci v. Georgetown Univ., 2007 WL 2581877 at *4 (D.D.C. Sept. 10, 2007).

In considering Defendant's Motions to Dismiss, the Court must deem Mr. Orozco's well-pleaded facts from the Amended Complaint as true, Summit Health Ltd. v. Pinhas, 500 U.S. 322, 325 (1991), and grant Plaintiff the benefit of all inferences that can be derived from the facts. Sparrow, supra, 216 F.3d at 1114; Maniaci, supra, at *4; Schuler v United States, 617 F.2d 605, 608 (D.C. Cir. 1979).

"At the pleading stage, only an allegation of the existence of a policy, practice, or custom and its causal link to the [federal law] deprivation suffered is required." Maniaci, supra, at *8; Atchinson v. District of Columbia, 73 F.3d 418, 419 (D.C. Cir. 1996)(stating that "a plaintiff need not allege all the facts necessary to prove its claim" in the complaint); Amons v. District of Columbia, 231 F. Supp. 2d 109, 114 (D.D.C. 2002).

The Amended Complaint establishes causes of action against the Defendants for disability discrimination. It is undisputed that Mr. Orozco is blind, and thus protected by the ADA and the DC Human Rights Act. Am. Complaint at 19 ¶ 54. It is further undisputed that Mr. Orozco's dog is a guide dog "individually trained by The Seeing Eye, Inc., to work or perform tasks" within the definition of a service animal under the federal regulations promulgated by the U.S. Department of Transportation. Id. at ¶55.

According to the Amended Complaint, the operations of New Today Bus Corp. (NTBC) and Today's Bus, Inc. (TBC) constitute public accommodations within the definition of the ADA, the federal regulations thereunder, and the D.C. Human Rights Act, all of which forbid Defendants from excluding people with disabilities accompanied by

service animals from their bus services. Am. Complaint at 6 ¶11, 7 ¶12. The federal and local statutes and regulations specifically define such exclusion as disability discrimination. 42 U.S.C. §12182(b)(2)(A); 42 U.S.C. §12184(b)(1) & (2); 49 C.F.R. § 37.3; 28 C.F.R. §38.104 (all cited in Am. Complaint at 14-15). According to the Amended Complaint, Defendants "obstructed, harassed … [and] denied Mr. Orozco equal access" to their interstate bus services with his service animal between Washington, DC and New York City. Am. Complaint at 19 ¶¶ 56-57; 8-11 ¶¶ 18-27.

Plaintiff's allegations against each Defendant are sufficient to establish or infer their liability for the discriminatory actions taken by the agents and/or employees of NTBC and TBC, who, acting under the policy or practice in effect, failed to heed Plaintiff's (and the police officers') notice that he was entitled to ride the bus with his service animal. Mr. Orozco alleged that the station workers at 610 I Street NW and the bus driver discriminated against him based on his disabilities by singling him out and preventing him from boarding the bus with his service animal. Am. Complaint at 9. The police officers explained to the DC station workers and the driver that they must allow Mr. Orozco to board the bus with his guide dog. Id. The conduct of these workers resulted in delaying Mr. Orozco's travel, and subjecting him to significant humiliation, heightened by a four hour trip on the bus with the passengers who witnessed the discrimination. Id.

The Complaint also alleges that Mr. Orozco explained to station agent workers that he would be returning to Washington, DC from New York City the following day and requested they alert the New York City station workers that he had the right to travel with his service animal. Nevertheless, he was subjected to discrimination on the return trip from New York City to DC the following day. He called the police to gain access to the bus,

3

and was finally forced to sit in the back of the bus with his service animal. As described in detail in the Complaint, the illegal discriminatory conduct, harassment, and willful disregard of Mr. Orozco's rights carried out by station agents at 610 I St NW, Washington, DC and at 13 Allen Street, in New York subjected Mr. Orozco to humiliation and injury.

    A.  <u>Allegations regarding New Today Bus Corporation</u>

Paragraph 11 of the Amended Complaint identifies New Today Bus Corporation as a New York corporation that provides an interstate bus transportation service and operates stations at 13 Allen Street in New York City and at 610 I St NW in Washington, DC. As such, NTBC is a public accommodation under Title III of the Americans with Disabilities Act and its implementing regulations promulgated by the U.S. Department of Justice and the U.S. Department of Transportation which prohibit disability-based discrimination.

According to a stipulation entered into by co-defendant Ming Yu, NTBC does (or did) business as Today's Bus, Inc. at the time of Mr. Orozco's experience. <u>See</u> Meet & Confer Report at 2, filed June 18, 2007 [Dkt. # 18]. This stipulation directly contradicts Defendants' assertions in their motions to dismiss. Mot. to Dismiss at 1. Moreover, the Certificate of Occupancy issued to NTBC on April 30, 2007 for 610 I Street NW[2] does not mean that NTBC did not occupy the office space at 610 I St NW *prior to* April 30th. The Certificate reflects a "Change of Ownership," *not*, as Defendants suggest, that NTBC had no previous relationship with Defendant Today's Bus, Inc., the prior occupant of the premises where Plaintiff experienced the discriminatory conduct. <u>See</u> Exhibit D appended to Mot. to Dismiss.

---

[2] Exhibit D appended to Mot. to Dismiss.

4

As described in the Complaint, the failure of NTBC's employees, agents, or contract workers to honor Mr. Orozco's civil rights, or post a notice of those rights and a complaint process, or train the station workers or bus drivers, establishes its liability for violations of the DC Human Rights Act and the ADA and its regulations.

B.  <u>Allegations regarding Pao Hua Yu</u>

The Amended Complaint names Pao Hua Yu in her official capacity as the President of New Today Bus Corporation doing business as Today's Bus. Am. Complaint at 7 ¶13.  Defendant acknowledges that she is the owner and manager of NTBC and has held that position since January 2006.  Mot. to Dismiss at 2 ¶ 3.  This implicates Ms. Yu during the time period when Mr. Orozco experienced disability discrimination in New York City at 13 Allen Street and in attempting to board a bus leased by NTBC.  As the owner and manager of NTBC, the Complaint alleges that Ms. Yu "is responsible for the company's operations, management and policies in New York and the District of Columbia, including the discriminatory policy regarding service animals." <u>Id</u>.  Defendant Pao Hua Yu is the aunt of Defendant Ming Yu; she is also his employer and supervisor.  Mr. Ming Yu, in turn, has knowledge of Mr. Orozco's experience and spoke with Mr. Orozco regarding his complaint.  <u>See</u> Exh. B,  Deposition Tr. at 26:17-22; 27:4-9; 86-93 [testimony of Defendant  Ming Yu on Sept.10, 2007].

The Amended Complaint alleges the existence of a discriminatory policy and practice that excludes service animals which resulted in the Defendants' exclusion of Mr. Orozco from their bus service based on his disability. Am. Complaint at 11 ¶28; 20 ¶60. Plaintiff alleges that Defendants' actions and inaction, such as their failure to adopt policies or train and supervise their employees and agents to comply with federal and local anti-

5

discrimination laws, resulted in harm to Mr. Orozco. These allegations and claims are more than sufficient to establish a plausible cause of action against Defendants for their negligent failure to train or supervise workers under the federal notice pleading rules and to defeat the motions to dismiss. <u>Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit</u>, 507 U.S. 163, 163-69 (1993); <u>Maniaci</u>, <u>supra</u>, at *8; <u>Kivanc v. Ramsey</u>, 407 F. Supp.2d 270 (D.D.C. 2006). Defendants' egregious violations of federal anti-discrimination laws that caused harm to Mr. Orozco -- even after he advised them of his planned return trip -- reflect Defendants' reckless deprivation of Plaintiff's federal legal rights and their negligent failure to adopt anti-discrimination policies, practices or train their workers. <u>Id.</u>, 407 F. Supp.2d at 273-74. As the principal of the company that operates the bus service, Defendant Pao Hua Yu is liable in her official capacity for the discriminatory actions of the station agents and workers, and the bus drivers against Mr. Orozco in New York City and in Washington, DC. <u>Triplett v. District of Columbia</u>, 108 F.3d 1450, 1453 (D.C. Cir 1997); <u>Kivanc v. Ramsey</u>, 407 F. Supp.2d 270 (D.D.C. 2006).[3]

   C.   <u>Allegations regarding Jimmy Zhang</u>

Paragraph 15 of the Amended Complaint describes Jimmy Zhang as the "manager of daily operations of New Today Bus Corporation" at 610 I Street NW, Washington, DC. That is the same address where Mr. Orozco encountered discrimination at the hands of bus workers en route to New York City, and upon his return to the District from New York City. The Amended Complaint alleges that as a manager, Mr. Zhang had responsibility for "the company's discriminatory policy regarding service animals." Am. Complaint at 8 ¶15.

---

[3] In light of the governing case law regarding evidence of supervisory liability at the pleading stage, Plaintiff moves the Court to strike Defendants' mischaracterization of Plaintiff's allegations in the Amended Complaint as "frivolous."

6

As reflected in the District government's online registration form for NTBC provided by Defendants, Mr. Zhang is the "registered Agent" for NTBC. Exh. C appended to Mot. to Dismiss.  The fact that the DC Department of Consumer and Regulatory Affairs did not formally register NTBC until April 6, 2007 has no bearing on whether Defendant Zhang worked at 610 I Street NW for NTBC or for Today's Bus Inc. at the time Mr. Orozco was barred from the bus with his guide dog. This establishes Mr. Zhang's direct or supervisory liability under the ADA and the DC Human Rights Act.

Even if, as Defendant Zhang suggests, "his position was sales agent in charge of selling bus tickets[,]" Mot. to Dismiss at 1 ¶ 2, the Amended Complaint alleges that Mr. Orozco explained to the station agents and others (such as ticket sales agents) that he was blind and needed his service animal to accompany him on the bus.  Plaintiff further alleges that he was allowed to board the bus only after he called the police to intervene and explain to the workers that he was entitled to ride with his service animal.

Defendant Zhang claims that he started working for NTBC in Washington, DC in "April 2007" and subsequently "quit [NTBC] in September 2007 and no longer works there." Mot. to Dismiss at 1 ¶ 2.  He does not dispute the fact that he was reportedly working at 610 I St NW in late December 2006 and early January 2007 for Today's Bus, Inc.  prior to his employment with NTBC.  Indeed, on March 8, 2007, Mr. Zhang accepted service at 610 I Street NW of the original complaint on behalf of Today's Bus, Inc. and Dong Jia Yong.  Dkt # 25.  Moreover, in an interview with a Washington Post reporter published on March 8, 2007, Defendant Zhang identified himself as "the son of the owner of Todays Bus located at 610 I St NW." See  Exh. A, "Bus Firm Prohibited Guide Dog, Suit Says",  Washington Post,  March 8, 2007.

7

**The questions of the time period when, and the company for which, Mr. Zhang worked, and the relationship between the companies, are at issue in Plaintiff's case. But inasmuch as Plaintiff seeks damages, the fact that Defendant Zhang no longer works for NTBC is irrelevant.**

## II.  The Court Should Disregard Defendants' Conclusory Statements Raised Outside of the Scope of Allegations in the Amended Complaint

**In deciding a Rule 12(b)(6) motion to dismiss, the Court must rely on the allegations of the Complaint, rather than Defendant's conclusory statements that contradict the allegations of the Complaint. <u>Henthorn v. Dep't of Navy</u>, 29 F.3d 682, 688 (D.C. Cir. 1994). <u>See</u> <u>also</u> <u>Taylor v. FDIC</u>, 132 F.3d 753, 762 (D.C. Cir. 1997).**

**Plaintiff named Today's Bus, Inc., New Today Bus Corporation, and Wilcar Tours as Defendants, as well as the principals and employees of these companies in their official capacities. Plaintiff has sufficiently pleaded his claims against these companies and their principals, managers, employees and agents. Defendants have intentionally obfuscated their respective roles in the interstate bus system by, for example, incorporating as multiple entities which at various times reportedly lack the appropriate business operating licenses,[4] and leasing buses, and contracting workers for operations that are apparently intertwined, <u>e.g,</u> through the use of shared ticket terminal/offices telephone lines, and websites, in New York City and Washington, DC.[5] At the time Mr. Orozco was discriminated against, the individuals named in the complaint worked at the locations cited. In the Amended**

---

[4] For example, according to the document submitted by Defendants, the business license for Today's Bus, Inc. by the D.C. Department of Consumer and Regulatory Affairs, was revoked. <u>See</u> Exh. A appended to Mot. to Dismiss.

[5] Defendant Ming Yu testified that he does not know whether his aunt, Pao Hua Yu is the owner of NTBC, because her position, and the origin of NTBC, are "top secret … Since no one knows about it." Exh.B, Deposition Tr. at 29:12-22; 30:1-4.

Complaint, Plaintiff alleges the involvement of workers affiliated with these companies, and as such, the companies and their principals are liable.

Defendants must not be allowed to hide behind the corporate confusion they have orchestrated in an apparent attempt to evade public and governmental scrutiny and liability.  Plaintiff has the right to further discovery to fully establish that the Defendants named in the Amended Complaint are liable for the discrimination against him.

### III.    The Court Should Allow Plaintiff Time to Conduct Discovery Before Converting Defendant's Motion to a Summary Judgment Motion

The Court should deny the Motion to Dismiss, rather than convert it to a summary judgment motion at this juncture.  After a complaint is filed, discovery and pretrial litigation procedures afford the parties the opportunity to narrow the issues and the factual disputes. Conley v. Gibson, 355 U.S. 41, 47-48 (1957).  There is neither a requirement, nor an expectation, that Plaintiff must prove his case through the pleadings set forth in the complaint, without the benefit of discovery.

Plaintiff is entitled to have "a full opportunity to conduct discovery[,]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).  Summary judgment "ordinarily 'is proper only after the plaintiff has been given adequate time for discovery.'" Americable Int'l, Inc. v. Dep't of Navy, 129 F.3d 1271, 1274 (D.C. Cir. 1997).  Moreover, summary judgment is not appropriate where, as here, there are genuine issues of material fact in dispute. Cf. Kingman Park Civic Ass'n v. Williams, 348 F.3d 1033, 1041 (D.C. Cir. 2003).  This Court may deny a motion for summary judgment under Fed. R.Civ.P. 56(f) to permit Plaintiff an opportunity to conduct discovery and thereby develop the facts needed to present affidavits to defeat a summary judgment motion.  This would effectuate the purpose of Rule 56(f) to prevent 'railroading' the non-moving party through a premature motion for summary

judgment before the non-moving party has had a full opportunity to conduct discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1996).

Plaintiff seeks an opportunity to conduct discovery pursuant to the Scheduling Order dated October 19 & 23, 2007 [Dkt. # 30], and Fed.R.Civ.P. 56(f). See also Felder v. Johanns, 2007 WL 1549088 *4 (D.D.C. May 25, 2007); Amons v. District of Columbia, 231 F.Supp.2d at 109.

At the October 19, 2007 status conference, the Court advised defense counsel Michael Lu that it would defer ruling on any dispositive motions until after the close of discovery. The Court then set the litigation schedule, guided by the parties' input and agreement, under which the deadline for dispositive motions and briefing is January 31, 2008.[6] Plaintiff respectfully requests that the Court adhere to that schedule.

For the foregoing reasons, Plaintiff respectfully requests the Court to deny the Motions to Dismiss filed by Defendant New Today Bus Corporation, Jimmy Zhang, and Pao Hua Yu. A proposed Order is attached.

                                                        Respectfully submitted,

| /s/<br>Marjorie Rifkin, Esq. Bar # 437076<br>University Legal Services - P&A<br>220 I Street NE #130<br>Washington, DC 20002<br>(202) 547-0198 ext 112<br>(202) 547-2662 (fax) | Dated: November 13, 2007 |
|---|---|

ATTORNEY FOR PLAINTIFFS

---

[6] The Court should direct Defendants to pay to Plaintiff interim attorney's fees for the preparation of this Memorandum in Opposition to Defendants' premature motions.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **Jahinnslerth Orozco,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civ. Action #** |
| v. | ) | |
| | ) | **1:07CV000444 [EGS]** |
| | ) | |
| **Today's Bus, Inc.** | ) | |
| | ) | **Jury Trial Demand** |
| | ) | |
| **and** | ) | |
| **Dong Jia Yong, President** | ) | |
| **in his official capacity** | ) | |
| **Today's Bus, Inc.** | ) | |
| | ) | |
| **and** | ) | |
| **Ming Yu, Manager** | ) | |
| **in his official capacity** | ) | |
| **Today's Bus, Inc.** | ) | |
| | ) | |
| **and** | ) | |
| **Wilcar Tours, Inc.** | ) | |
| | ) | |
| **and** | ) | |
| **William Ruiz, President** | ) | |
| **in his official capacity** | ) | |
| **Wilcar Tours, Inc.** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **New Today Bus Corp., dba Today's Bus** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **Pao Hua Yu, President** | ) | |
| **in her official capacity** | ) | |
| **New Today Bus Corp., dba Today's Bus** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **Tom Chan, Manager** | ) | |
| **in his official capacity** | ) | |
| **New Today Bus Corp., dba Today's Bus** | ) | |

```
and                                        )
                                           )
Jimmy Zhang, Manager                       )
in his official capacity                   )
New Today Bus Corp., dba Today's Bus       )
                                           )
                                           )
                        Defendants.        )
                                           )
_____)
```

## ORDER

Having reviewed the Motions to Dismiss filed by Defendants New Today Bus Corp., Jimmy Zhang and Pao Hua Yu, and Plaintiff's Memorandum in Opposition, it is hereby ORDERED, Defendants Motions to Dismiss are DENIED;

ORDERED, that Plaintiff Jahinnslerth Orozco's First Amended Complaint sets forth sufficient allegations to establish plausible causes of action against Defendants New Today Bus Corporation, Jimmy Zhang, in his official capacity, and Pao Hua Yu in her official capacity; and

ORDERED, that Defendants New Today Bus Corporation, Jimmy Zhang, and Pao Hua Yu shall pay reasonable attorney's fees and costs incurred by Plaintiff in the preparation and filing of Plaintiff's Memorandum in Opposition to the Motions to Dismiss.

_____
**Hon. Emmet G. Sullivan**
**United States District Court for**
**The District of Columbia**

Dated: _____



EXHIBIT A

**B2** THURSDAY, MARCH 8, 2007

**U.S. DISTRICT COURT**

# Bus Firm Prohibited Guide Dog, Suit Says

*By Sue Anne Pressley Montes*
*Washington Post Staff Writer*

Joe Orozco goes everywhere with his seeing-eye dog, Gator, a relationship protected by federal law. Now Orozco has sued a Chinatown bus company, claiming discrimination because employees tried to bar him and his dog from boarding buses in Washington and New York.

On New Year's Eve, employees of Todays Bus Inc. said Orozco could not bring his dog on a bus leaving downtown Washington for Manhattan. They relented only after Orozco called D.C. police, who explained federal disabilities law permitting service animals to accompany their owners, according to a suit filed yesterday in U.S. District Court.

On Jan. 1, Orozco again met resistance as he and his dog tried to board another of the company's buses for the return trip to the District. That time, the suit said, they were allowed on after heated argument and a long delay — but were instructed to go to the back of the bus.

Orozco said he spent the four-hour trip on the seat by the toilet, feeling "humiliated."

"I felt hopeless that I couldn't do anything to change what had happened," he said in an interview yesterday. ". . . I thought, if I wasn't blind, this wouldn't be happening. Being discriminated against was one thing, but having been segregated was upsetting."

Orozco, 24, is an AmeriCorps volunteer who works as a caseworker with refugees in the District. His suit alleges discrimination under the Americans With Disabilities Act of 1990, which prohibits discrimination in services, facilities or public accommodations. He seeks a federal order requiring the bus company to train its staff and make a formal apology, plus monetary damages.

"It's shocking that they didn't understand their obligations," said Amy Metzel, an attorney with University Legal Services, the protection and advocacy agency for D.C. residents with disabilities that is representing Orozco. "It's a very blatant case of discrimination based on disability."

A man who identified himself as the son of the owner of Todays Bus, located at 610 I St. NW, said yesterday that he regrets what happened, attributing the problems to employees' difficulties in understanding English and their lack of familiarity with the law.

"We feel bad for it," Jimmy Zhang said. "It sounds like our company is bad, but now our company knows what laws exist and what we must do."

Orozco, a Houston native who moved to the District last year, has been blind since a fall when he was 2, he said. Until he acquired Gator, a 75-pound German shepherd, in July 2004, he used a white cane to get around, he said. He described the dog, who came from the Seeing Eye in Morristown, N.J., the country's pioneer guide dog school, as well groomed and well trained.

The incidents marred what was intended to be a New Year's holiday in New York for him and four friends, he said. Because of budget concerns, they opted to try Todays Bus for the first time, he said; a one-way ticket from the District to New York costs $20.

When Orozco reached the front of the passenger line with Gator in the District, he said, an employee prevented their boarding, saying no animals were allowed on the buses. Ignoring Gator's identification card as a service animal, the employee told Orozco that his only choice was to put the dog beneath the bus in the luggage compartment, the lawsuit alleges.

"I told him that was ridiculous," Orozco said yesterday.

Orozco said he has had minor problems with local store owners and restaurant managers who initially tried to bar his dog, then relented when he explained. "But I've never been told I couldn't get on public transportation," he said.

He said he took care to inform the company he would be returning the next day, hoping to avoid a repeat of the first incident. But when he arrived at the bus company station in Manhattan, the reaction was worse.

"There was not much of an explanation beyond, 'No, dogs, you can't get on'," he said. The bus left as the argument continued, he said, and when an employee said he could get on the next bus if he and the dog sat in the back, he agreed.

"It was cold, we were already late," he said. "The situation was such that we just wanted to get home."



Capital Reporting Company

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---

Jahinnslerth Orozco            :

    Plaintiff,            :

    v.            : C.A. No:

Today's Bus, Inc., Dong Jia Yong,    : 1:07CV00444

Ming Yu, Wilcar Tours, Inc., and    :

William Ruiz            :

    Defendants.            :

                    :

---

        Washington, D.C.

        Monday, September 10, 2007

Deposition of:

    MING ZHONG YU

called for oral examination by counsel for Plaintiff, pursuant to notice, at the University Legal Services, 220 I Street, Northeast, Suite 130, Washington, D.C., before Jacqueline Schultes, Registered Professional Reporter and Certified Realtime Reporter, beginning at 2:00 p.m., when were present on behalf of the respective parties:

Page 26

1  A.  That I handle it. I just report to my
2  accountant to handle my own taxes.
3  Q.  Who pays you?
4  A.  The company.
5  Q.  Is there a particular person who handles
6  payroll?
7  A.  Regarding my salary I pick up from 13 Allen
8  Street usually from the secretary.
9  Q.  How much is your annual salary?
10  A.  I got pay $1,800 a month. That's like around
11  $20,000.
12  Q.  Do you get a share in the profits of the
13  business?
14  A.  No.
15  Q.  Do you get a W-2 at the end of the year?
16  A.  Yes.
17  Q.  We would like to get a copy of your W-2. Who
18  is your supervisor?
19  A.  Pao Hua Yu.
20  Q.  What is her title?
21  A.  Her title I don't know.
22  Q.  Is she the owner of the company?

Page 27

1  A.  I don't know that.
2  Q.  Do you know who owns the company?
3  A.  No, because she's the one who called me in.
4  Q.  She called you in and what is her
5  relationship to you again?
6  A.  She is my aunt.
7  Q.  When you say aunt, that means she is your
8  mother or father's sister?
9  A.  Right.
10  Q.  Where does she work?
11  A.  If I ever need to find her, 13 Allen Street,
12  that's where I were able to look for her. Otherwise, I
13  just leave a message for the secretary and let her know
14  that I'm looking for her.
15  Q.  She's your aunt. You don't see her in other
16  contexts besides work?
17  A.  She live somewhere else. We live in the same
18  city, but different borough.
19  Q.  Where does she live?
20  A.  She live in New York, Manhattan.
21  Q.  What's her home address?
22  A.  Can you get from the attorney?

Page 28

1  Q.  Do you know it?
2  MR. CHANG:  I don't know where she lives. If
3  you know, say you know or if you don't, say you don't.
4  THE WITNESS:  She live in 157 Allen Street.
5  BY MS. METZEL:
6  Q.  So 157 Allen Street. Do you have an
7  apartment number?
8  A.  2-B.
9  Q.  Is that a business address or a residential
10  address?
11  A.  Residential address.
12  Q.  Does she live alone or does someone else live
13  there with her?
14  A.  I know she live with a dog. I just saw her
15  last night.
16  Q.  What offices does New Today's Bus have in New
17  York? You mentioned 13 Allen Street and you mentioned
18  198 Randolph. Are there any other offices in New York?
19  A.  No.
20  Q.  In both of those locations New Today's Bus is
21  the only company operating out of that address?
22  A.  Yes.

Page 29

1  Q.  Do you know when Ms. Yu started the company?
2  A.  No. I only know that when she call me in.
3  Regarding how she set the whole thing up, I didn't
4  know. All I know is she ask me in on that day.
5  Q.  What were you doing before you started
6  working for New Today's Bus?
7  A.  I was in a company called Pri-America,
8  P-R-I-A-M-E-R-I-C-A, Financial Service.
9  Q.  What was the title of your job there?
10  A.  It wasn't a job. It was a commission base,
11  self.
12  Q.  Did you hear anything from Ms. Yu about when
13  she started the business? Were you aware when the
14  business began?
15  A.  No. I think that's a top secret because as
16  far as I know is when she called me in, I don't know
17  how she arranged her -- the whole company or whose
18  partnered or anything like that. All I know is she
19  called me in.
20  Q.  Why do you say it's top secret?
21  A.  Since no one knows about it. Before as when
22  I got in, more in the company, I found little bit more

Page 30

1  about regarding there's a partner involved and so many
2  thing that I was very confusing regarding how the
3  company is, and also just like -- she just called me in
4  for a job.
5      Q.  You said there is a partner involved?
6      A.  Right.
7      Q.  Who is the partner?
8      A.  I don't know that.  All I know is that there
9  is a partner but who is the partner.
10     Q.  How did you find out there was a partner
11  involved?
12     A.  It's like I heard from someone else because
13  the other employee was like talking in the office
14  regarding what happened to them, who they meet.  And it
15  was like small talk and someone bring up, I see he's
16  the owner.  It was just small talk.  I don't know if
17  that's reliable.
18     Q.  So it's a man, the partner is a man?
19     A.  I don't know.  It was just small talk.
20     Q.  Who was talking about the partner?
21     A.  In the office, 198 Randolph Street, the other
22  two ladies I was working with.

Page 31

1      Q.  Can you give us her name?
2      A.  Kelly, and the other one is Amity; A-M-I-T-Y.
3      Q.  What are their last names?
4      A.  I don't know.  That's how I call her.
5      Q.  How long has she been working there?
6      A.  As far as I know, when I come in she will be
7  there.
8      Q.  You have been working with her for over a
9  year and you don't know her last name?
10     A.  That's how we always call her and we never
11  ask regarding their -- we never ask each other last
12  name because I don't know if you know the Chinese coach
13  is like whoever you want to be called, we just call
14  you.
15     Q.  So that may not be her real name?  She has
16  another Chinese name?
17     A.  Right.  The women in the office call my first
18  name, the first part of my name, Ming.
19         MS. METZEL:  We would like to get the names
20  of the two employees at 198 Randolph, the complete
21  legal names.
22         BY MS. METZEL:

Page 32

1      Q.  Who else do you think knows more about the
2  partner who is involved with Ms. Yu?  Would Tom Chen
3  know about that?
4      A.  I'm not quite sure on that.  What he know, I
5  couldn't read his mind.
6      Q.  How often do you meet with Tom Chen?
7      A.  I rarely see him because as I told you, most
8  of my time I spend at 198 Randolph Street.  If I ever
9  need to find him I just leave a message with the
10  secretary.
11     Q.  How long has he been working there?
12     A.  When I come, he already there.
13     Q.  So at least as of February, 2006?
14     A.  Right.
15     Q.  Who handles the money at New Today's Bus?
16     A.  Money, which part?
17     Q.  The customers pay money to ride the bus, who
18  does it go to?  Who collects it?  Does the bus driver
19  collect it or the ticket agent collects it?
20     A.  The bus driver never collect money, and how
21  they collect the money -- they never sell the ticket at
22  198 Randolph Street.  Regarding how they operate the

Page 33

1  whole company on the revenue side is beyond my
2  knowledge.
3      Q.  Who would know about that?  Who in the
4  company handles that, the finances?
5      A.  You might want to ask the secretary.
6         MS. METZEL:  I'm going to need her name, too.
7  I think you gave us her first name.
8  BY MS. METZEL:
9      Q.  What was her name again?
10     A.  Annie; A-N-N-I-E.  She just came.  That's how
11  we call her.
12     Q.  Do you know what her real name is?
13     A.  No.
14        MS. METZEL:  We would like to get her real
15  name.
16  BY MS. METZEL:
17     Q.  Is there another accountant or bookkeeper or
18  chief financial officer?
19     A.  I don't know that.
20     Q.  Does Tom Chen handle the money?
21     A.  No, he doesn't.
22     Q.  Are there any other employees for New Today's

Page 86

1  or if they forgot something on the bus, something like
2  that.
3      Q.  Did you ever discuss this with anyone, the
4  issue of a dog on the bus?
5      A.  No.
6      Q.  What about, you spoke with Mr. Orozco about
7  his concern. Did you take any action after you heard
8  from him?
9      A.  Yes.
10     Q.  What did you do?
11     A.  According to my memory, I popped by the 13
12 Allen Street and I saw Tom Chen and asked him regarding
13 what happened, what Mr. Orozco, according to what he
14 told me, I just repeat it back to him regarding the
15 incident. The answer I got from him is that he didn't
16 know anything about it.
17     Q.  When you talked to Mr. Orozco, did he tell
18 you how he got your name and number to call you?
19     A.  He didn't got my name. He got the numbers
20 and he call in. Then I told him my name.
21     Q.  After you spoke with him, did you learn that
22 he was blind?

Page 87

1      A.  After I spoke with him, first of all, I don't
2  know if he tell you that is because I actually figured
3  out that he's blind. That during my conversation with
4  him, I feel like something is not right. According to
5  what he told me when he first called me, he told me
6  what happened with the D.C. office regarding the
7  people, that they want to bring the dog back on to the
8  bus and began to fight back and forth. First of all, I
9  just confirmed whatever the D.C. office did was correct
10 and after that I say that, he told me how he got the
11 police involved. That bring up a feeling that
12 something is not right. According to my feeling is if
13 you have a pet, he never told me it is a blind dog -- I
14 mean, a guided dog. I assume it's a pet.
15         He never told me it is a guide dog. I assume
16 it's pet. I handle it the way I handle a pet. When he
17 called in and got the police involved, I feel like
18 something is not right. If you have a pet and you
19 don't put that in the cage and if it go wild, it's
20 pretty danger to the people on the bus. Based on my
21 common sense, you shouldn't call the police on this.
22 So I asked him what kind of dog is it. He tell me it

Page 88

1  is a guided dog, that he's blind. Then I handle it
2  different ways.
3      Q.  How did you handle it?
4      A.  I handle it. I just got more information
5  regarding what happened because when I first hear it
6  now in the first place before he told me he got the
7  police involved, I feel very uncomfortable with him.
8  It doesn't make sense. You have a dog and it is not in
9  a cage and you want to bring it on the bus. It doesn't
10 make sense. I wasn't like very happy to hear with him
11 to listen to him regarding the complaint. After he
12 told me that he got the police involved, my perspective
13 got changed because what I assumed was not correct.
14     Q.  What else did you learn about the situation?
15     A.  After that he let me know that he is blind
16 and it was a guide dog. He told me what happened in
17 New York.
18     Q.  What happened in New York? What did you
19 learn from him about what happened in New York?
20     A.  According to him he tried to get on the bus
21 in New York and the people in New York also give him a
22 hard time. According to him, they put him at the end

Page 89

1  of the bus near where the restroom is.
2      Q.  Did he tell you where he bought his tickets?
3      A.  No.
4      Q.  Did you learn that a female employee snatched
5  the tickets from his companion to prevent him from
6  getting on the bus?
7      A.  What do you mean?
8      Q.  Did you know he was traveling with a
9  companion?
10     A.  No.
11     Q.  Did you know that a New Today's Bus employee
12 took the tickets from him and his companion so he
13 couldn't get on the bus, did he tell you about that?
14     A.  I'm not quite sure about that. If I remember
15 correctly, he never say he have trouble with someone.
16 I just know that the people in New York give him a hard
17 time regarding the detail.
18     Q.  Did you find out what happened when the
19 police -- did the police come in D.C.?
20     A.  What do you mean?
21     Q.  You said he called the police.
22     A.  Right.